IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TRICIA MUFF                    :        CIVIL ACTION
                               :
        v.                     :
                               :
MARTIN L. DRAGOVICH, et al.    :        NO. 05-5251

MEMORANDUM

Bartle, C.J.                                    March 12, 2007

        Before the court is the habeas corpus petition of
Tricia Muff ("Muff" or "petitioner") pursuant to 28 U.S.C.
§ 2254.  Muff challenges her detention following a conviction in
the Court of Common Pleas of Delaware County for first degree
murder, aggravated assault, and endangering the welfare of a
child.  The victim was a twelve-month-old child, Madison
Bierling, for whom petitioner was baby-sitting on December 1,
1998.  Petitioner was sentenced to life imprisonment.

        In her petition, Muff raises five different claims that
she was denied her Sixth Amendment right to the effective
assistance of counsel.  She also contends that she was denied her
Fifth Amendment privilege against self-incrimination, her Fifth
and Sixth Amendment rights to counsel and that she was denied due
process of law because the evidence was insufficient to convict
her of first degree murder.[1]

_____

1.  Although Muff refers only to the Fifth and Sixth Amendments
in her petition, she contends that her constitutional rights were
                                              (continued...)

I.

The underlying facts, taken in the light most favorable to the Commonwealth, are as follows.  In February of 1998, two months after her daughter Madison was born, Kelsey Bierling ("Bierling") contracted with her neighbor, petitioner Tricia Muff, to provide all-day child care while Bierling worked as a teacher in the Upper Darby School District.  On December 1, 1998, Bierling dropped Madison off at Muff's home at approximately 6:30 a.m.  Madison was then in Muff's sole care.

At approximately 2:30 that afternoon, Bierling received a telephone call from Muff advising her that Madison was having trouble breathing.  Bierling left work and returned to Muff's to find Madison lying rigid and unresponsive in her crib.  An ambulance arrived, administered emergency care, and took Madison to Delaware County Memorial Hospital.  Later in the day, Madison was moved to Children's Hospital in Philadelphia where Bierling was told that her daughter was brain dead.  Madison was pronounced dead at the hospital the following morning.

The medical evidence introduced at trial indicated that Madison died after being severely beaten and shaken.  According to the doctor who conducted the autopsy, Madison was grasped

---

1.(...continued)
violated in the state court system.  Hence, her allegations more properly arise under the Fourteenth Amendment.  However, the Supreme Court has incorporated each of Fifth and Sixth Amendment claims that Muff alleges into the Fourteenth Amendment.  See Duncan v. Louisiana, 391 U.S. 145, 148.  Thus, we will deem Muff to have constructively brought her claims under the Fourteenth Amendment as well.

around the torso, shaken repeatedly and then thrown against an
object such as a flat surface.  She had a 4-5 inch fracture on
the skull which resulted from an impact of such force that the
brain swelled causing the fracture to gape.  There was also
hemorrhaging between the brain area and the skull as well as
optic sheath, neck muscle and retinal hemorrhaging.  Madison also
had multiple bruises on her chest, face and buttocks.  Each of
the prosecution's medical expert witnesses testified that
Madison's injuries could not have been the result of an
accidental fall.[2]

Muff gave three separate statements to the police in
the period following Madison's hospitalization.  In the first
Muff said that Madison had had trouble breathing but did not
mention any kind of fall or accident and said nothing about
throwing down the baby.  In the second statement, Muff said that
she had tripped carrying both her son and Madison into the house
and that Madison, falling approximately four feet, hit her head
on the concrete step and then on the ground.  Again, Muff did not
admit to throwing Madison and denied hitting or pinching Madison
on her chest.  In the third statement, given after Madison died,
Muff explained the fall again and then admitted that she had
"lost it for a second" and threw Madison on the ground one time
after Madison had vomited and was crying.

_____

2. Three different defense experts retained by trial counsel,
direct appeal counsel, and PCRA counsel also reached the same
conclusion.

        The case was tried before The Honorable William R.
Toal, Jr. and a jury in the Court of Common Pleas of Delaware
County.  At trial, the prosecution presented three medical
experts on the cause of Madison's death as well as Muff's
statements to the police.  It was the defense's theory that
Madison's death was an accident.  Defense counsel called as
witnesses:  (1) Muff, who testified about an accidental fall with
Madison; (2) Lawrence Thibault, a bio-engineer who had no medical
training, who testified that Madison's fractured skull and head
injuries were consistent with the accidental fall as described by
Muff; and (3) numerous character witnesses who said that Muff had
an excellent reputation as a law-abiding person and who described
the loving and long-term care-giver relationship between Muff and
Madison.  Judge Toal instructed the jury on the crimes of first
degree murder,[3] third degree murder,[4] involuntary manslaughter,[5]
aggravated assault, and endangering the welfare of a child.  On
July 23, 1999, the jury convicted Muff, who had no prior criminal

---

3.  Under Pennsylvania law, "[a] criminal homicide constitutes
murder of the first degree when it is committed by an intentional
killing."  18 Pa. Cons. Stat. Ann. § 2502(a).

4.  Under Pennsylvania law, murder of the third degree is a
criminal homicide that is not first degree or second degree
(felony) murder.  18 Pa. Cons. Stat. Ann. § 2502(c).

5.  Under Pennsylvania law, "[a] person is guilty of involuntary
manslaughter when as a direct result of the doing of an unlawful
act in a reckless or grossly negligent manner, or the doing of a
lawful act in a reckless or grossly negligent manner, he causes
the death of another person."  18 Pa. Cons. Stat. Ann. § 2504(a).

record, of first degree murder, aggravated assault, and endangering the welfare of a child.

II.

Following Muff's conviction, Judge Toal sentenced her to life imprisonment without parole on September 22, 1999.  Trial counsel filed post-sentence motions on Muff's behalf and represented her at her sentencing.  On direct appeal, for which Muff had new counsel, she raised all of the claims now presented in this petition, except the claims that trial counsel was ineffective for failing to advise Muff as to the most effective defense and for encouraging petitioner to perjure herself. Direct appeal counsel presented the following claims in the Pennsylvania Superior Court:  (1) insufficient evidence to prove first degree murder; (2) the trial court error in not suppressing Muff's third statement to police; and (3) ineffective assistance of trial counsel for failure to request or object to certain jury instructions.  The Superior Court affirmed the judgments of sentence on June 25, 2001.  See Resp., Ex. F; Commonwealth v. Muff, 779 A.2d 1220 (Pa. Super. 2001).  On January 2, 2002, the Pennsylvania Supreme Court denied Muff's timely petition for allowance of appeal.  See Commonwealth v. Muff, 793 A.2d 906 (Pa. 2002) (table).

Muff then retained current habeas counsel.  On February 13, 2003, counsel filed a petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541, et seq.  A hearing was held on September 25,

2003, again before Judge Toal.  At the hearing, Muff presented
testimony from Michael Malloy, Esquire, her trial counsel, Burton
Rose, Esquire, her direct appeal counsel, and Dr. David
Turkewitz, a medical expert and Chief of Pediatrics at York
Hospital.  Muff also proffered the testimony of David Rudovsky,
Esquire, a professor at the University of Pennsylvania Law
School, as an expert in professional responsibility and the
training of criminal defense attorneys.  Muff intended to have
Professor Rudovsky testify regarding the legal and ethical
obligations faced by a criminal defense attorney.  Judge Toal,
however, precluded his testimony.  On October 17, 2003, Judge
Toal denied Muff's PCRA petition.

Muff filed a timely appeal with the Pennsylvania
Superior Court, and on February 10, 2005, the Superior Court
affirmed Judge Toal's denial of the PCRA petition.  On April 11,
2005, the Superior Court denied Muff's application for
reargument/reconsideration.  Muff's petition for allowance of
appeal with the Pennsylvania Supreme Court followed.  It was
denied on September 13, 2005.

On October 5, 2005, Muff filed the present petition for
writ of habeas corpus under 28 U.S.C. § 2254.  The matter was
referred to a Magistrate Judge for a report and recommendation.
Thereafter, the Magistrate Judge recommended that the petition be
denied and that no certificate of appealability to the Court of
Appeals be issued.  Petitioner filed objections to the Magistrate

-6-

Judge's report, and the matter is now before the court for de novo review.  Fed. R. Civ. P. 72(b).

III.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. §2254.  Wertz v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000).  The AEDPA took effect on April 24, 1996 and governs all petitions for habeas corpus filed after that date.  Id.  As the present petition was filed on October 5, 2005, we must apply the AEDPA to Muff's claims for relief under 28 U.S.C. §2254.  Id.

A federal district court may consider an application for the writ of habeas corpus from a person in custody pursuant to a State court judgment "only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Wertz, 228 F.3d at 195-96.  However, there are several other limits on the power of federal courts to consider and grant such a writ.

First, a federal court is prohibited from granting a writ of habeas corpus in favor of a state prisoner unless he or she has exhausted available state remedies.  See 28 U.S.C. §§ 2254(b)(1)(A), (c).  If a petitioner has the right under applicable state law to raise a federal claim at the time his § 2254 petition is pending, he has not exhausted that claim.  Id. § 2254(c).  Exhaustion requires a petitioner to "fairly present"

-7-

all federal claims through one complete round of the state appellate review process.  O'Sullivan v. Boerckel, 526 U.S. 838, 845, 847 (1999); Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002).  In Pennsylvania, a state prisoner's claims may be deemed exhausted after the Superior Court of Pennsylvania denies the claim.  See In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases, No. 218 Judicial Administration Docket No. 1 (Pa. 2000).

        In addition, a petitioner generally cannot obtain federal habeas review when she fails to comply with a state procedural rule that is "independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991); Bronshein v. Horn, 404 F.3d 700, 707 (3d Cir. 2005).  "This doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.  Claims that are barred in this way are thus considered procedurally defaulted.  If a district court finds a habeas claim procedurally defaulted, it is barred from reviewing the merits of the claim unless the habeas petitioner can show that:  (1) the procedural rule was not independent and adequate; (2) there existed cause for his failure to comply with state procedural rules and prejudice resulting therefrom; or (3) a fundamental miscarriage of justice will occur if his petition is not considered.  Doctor v. Walters, 96 F.3d 675, 682-83 (3d Cir. 1996).  However, a state court must "consistently and

-8-

regularly" apply the relevant procedural rule for procedural
default to bar a claim.  Id. at 684.

Finally, the AEDPA sets out the standard of review a
federal court must employ when it considers a habeas petition
from a state prisoner.  The standard of review applied to the
state court's treatment of each of a petitioner's habeas claims
depends on whether the state court adjudicated the claim on the
merits.[6]

Federal habeas relief is barred as to any claim
adjudicated on the merits in a state court proceeding unless that
adjudication:

> (1)  resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as
> determined by the Supreme Court of the United
> States; or
>
> (2)  resulted in a decision that was based on
> an unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

28 U.S.C. §2254(d).  Our Court of Appeals has explained that
"'adjudication on the merits' has a well settled meaning:  a
decision finally resolving the parties' claims, with res judicata
effect, that is based on the substance of the claim advanced,
rather than on a procedural, or other, ground."  Rompilla v.
Horn, 355 F.3d 233, 247 (3d Cir. 2004) (citing Sellan v. Kuhlman,

------

6.  The statute provides that the habeas court is required to
review the state court "decision" that "resulted in" denial of
state court relief.  28 U.S.C. § 2254(d).  In this case, the
relevant decision is that of the Superior Court of Pennsylvania,
filed on June 25, 2001.

261 F.3d 303, 311 (2d Cir. 2001), rev'd on other grounds, Rompilla v. Beard, 545 U.S. 374 (2005).  If the state court decided the federal claim on the merits, the deferential standard in § 2254(d) applies "regardless of the length, comprehensiveness or quality of the state court's discussion."  Rompilla, 355 F.3d at 247 (citations omitted); see also Weeks v. Angelone, 528 U.S. 225 (2000); Chadwick v. Janecka, 312 F.3d 579, 605-07 (3d Cir. 2002).

As stated above, federal habeas relief is barred unless the state court adjudicates the matter in a manner "contrary to or, involv[ing] an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d).  In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained this standard of review under § 2254(d)(1) in the context of a claim of ineffective assistance of counsel.  See also Matteo v. Superintendent, SCI Albion, 171 F.3d 877 (3d Cir. 1999) (en banc).  The "contrary to" and "unreasonable application" clauses have independent meanings.  Williams, 529 U.S. at 405.  "Clearly established Federal law" covers the holdings, not the dicta, of the Supreme Court at the time of the challenged state court determination.  Id. at 412.  Before proceeding under either the "contrary to" or "unreasonable application" standards, a federal habeas court must identify the applicable "clearly established" law articulated by the Supreme Court and determine whether it resolves the petitioner's claim.  Outten v. Kearney, 464 F.3d 401, 413 (3d Cir. 2006); Matteo, 171 F.3d at 888.  The habeas

court must then determine whether the state court's decision was either contrary to or involved an unreasonable application of that law.  A federal habeas court may not grant relief "unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent."  Outten, 464 F.3d at 414 (internal citations omitted).

Section 2254(d)(2) requires a federal habeas court to assess whether the state court's determination was reasonable or unreasonable in light of the evidence presented in that proceeding.  If the state court's decision is unreasonable based on that evidence, the federal court is not bound by that decision.  Section 2254(e)(1) allows a habeas petitioner to attack "specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision." Id.  This section dictates that the state court's factual findings "must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence."  Id.

If the state court did not adjudicate a habeas claim on its merits, none of the deferential standards of § 2254(d) is inapplicable.  Instead, if the state court failed to decide the claim on the merits, or misunderstood the claim and decided some other claim, the federal habeas court must apply pre-AEDPA standards, that is, engage in de novo, plenary review.[7]  As our

_____

6.  A state court need neither cite the decisions of the Supreme
                                                    (continued...)

Court of Appeals has explained:  "[I]f an examination of the
opinions of the state courts shows that they misunderstood the
nature of a properly exhausted claim and thus failed to
adjudicate that claim on the merits, the deferential standards of
review in AEDPA do not apply."  Chadwick, 312 F.3d at 606.
Accordingly, under the pre-AEDPA standards a federal habeas court
owes no deference to a state court's conclusion of law or its
resolution of mixed questions of constitutional law and fact.

IV.

        Muff first claims that the evidence was insufficient to
sustain her conviction for first degree murder because no
evidence was introduced at trial that she intended to kill the
victim.  Muff raised this claim on direct appeal to the Superior
Court, which concluded that the evidence presented at trial was
sufficient to support Muff's first degree murder conviction.
Muff then raised a substantially similar issue before the PCRA,
where she argued that the failure of trial counsel to preserve a
distinct claim for insufficient evidence in violation of the
United States Constitution constituted ineffective assistance of
counsel.  After the PCRA court denied Muff's PCRA petition, she
appealed that decision to the Superior Court, which also denied

---

(...continued)
Court nor even be aware of its cases, "so long as neither the
reasoning nor the result of the state-court decision contradicts
them."  Early v. Packer, 537 U.S. 3, 8 (2002); see also Priester
v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004).

Muff's petition.  Muff has thus properly preserved her
insufficient evidence claim for federal court review.

    Muff first argues that the Superior Court did not
adjudicate this claim on the merits and that we should therefore
review the claim de novo.  We find this contention to be without
merit.  In the seven pages of its opinion dedicated to this
question, the Superior Court begins by setting forth the
applicable state law on sufficiency claims.  It next exhaustively
catalogued all of the Commonwealth's evidence from trial bearing
upon the question of intent.  Finally, the court concluded that
Muff's documented and repeated failure to take action after she
knew that Madison was extensively injured was sufficient to
establish Muff's intent to kill.  Clearly, this constitutes an
adjudication on the merits, and we will review Muff's claim under
the deferential standards of § 2254(d).

    Muff argues in the alternative that her conviction was
an objectively unreasonable application of established Supreme
Court precedent to the facts of her case.  28 U.S.C. § 2254(d).
In In re Winship, the Supreme Court first articulated the
principle that the Due Process clause of the Fourteenth Amendment
requires that a criminal defendant be confronted with "proof
beyond a reasonable doubt of every fact necessary to constitute
the crime with which [s]he is charged."  397 U.S. 358, 364
(1970).  In Jackson v. Virginia, the Supreme Court elaborated
that

-13-

the critical inquiry on review of the
sufficiency of the evidence to support a
criminal conviction must be ... to determine
whether the record evidence could reasonably
support a finding of guilt beyond a
reasonable doubt.  But this inquiry does not
require a court to 'ask itself whether it
believes that the evidence at the trial
established guilt beyond a reasonable doubt.'
Instead, the relevant question is whether,
after viewing the evidence in the light most
favorable to the prosecution, any rational
trier of fact could have found the essential
elements of the crime beyond a reasonable
doubt.

Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (quoting Woodby

v. INS, 385 U.S. 276, 282 (1966); and citing Johnson v.

Louisiana, 406 U.S. 356, 362 (1972)).

Federal habeas review of a sufficiency claim must be

based on state law.  Id. at 324; Jackson v. Byrd, 105 F.3d 145,

149 (3d Cir. 1997), cert. denied, 520 U.S. 1268 (1997).  The

applicable standard of review for a claim of insufficient

evidence is well settled in Pennsylvania:

In evaluating a challenge to the sufficiency
of the evidence, we view all the evidence
admitted at trial in the light most favorable
to the Commonwealth, which has won the
verdict, and draw all reasonable inferences
in its favor.  We then determine whether the
evidence was sufficient to have permitted the
trier of fact to find that each and every
element of the crimes charged was established
beyond a reasonable doubt.  'It is the
province of the trier of fact to pass upon
the credibility of witnesses and the weight
to be accorded the evidence produced.  The
fact finder is free to believe all, part or
none of the evidence.'  In addition, the
facts and circumstances established by the
Commonwealth 'need not be absolutely
incompatible with [the] Petitioner's
innocence, but the question of any doubt is

-14-

>           for the [fact finder] unless the evidence be
>           so weak and inconclusive that as a matter of
>           law no probability of fact can be drawn from
>           the combined circumstances.

Commonwealth v. Cruz-Centeno, 668 A.2d 536, 539 (Pa. Super. 1995)

(internal citations omitted).  This standard is equally

applicable to cases involving circumstantial evidence as long as

the combination of the evidence links the accused to the crime

beyond a reasonable doubt.  Commonwealth v. Randall, 758 A.2d

669, 674 (Pa. Super. 2000).

        In order to prove guilt of the offense of first degree

murder, the prosecution must show beyond a reasonable doubt that

the defendant acted with the specific intent to kill.

Commonwealth v. Spotz, 716 A.2d 580, 583 (Pa. 1998); 18 Pa. Cons.

Stat. Ann. §2502(a) and (d).  "The willful, deliberate, and

premeditated intent to kill is the element that distinguishes

first degree murder from other degrees of murder." Randall, 758

A.2d at 674 (citation omitted).  "A well recognized and generally

accepted inference to establish state of mind is that an actor

intends the natural and probable consequences of his act."

Commonwealth v. Meredith, 416 A.2d 481, 485 (Pa. 1980).  Thus,

specific intent to kill can be proven where the defendant

knowingly applies deadly force to the person of another.  Id.;

Commonwealth v. Hall, 701 A.2d 190, 196 (Pa. 1997) (citation

omitted), cert. denied, 523 U.S. 1082 (1999).  Additionally,

"[t]he element of specific intent to kill may be proven by the

circumstances surrounding the event, such as the seriousness and

-15-

type of the injuries." <u>Commonwealth v. Walter</u>, 849 A.2d 265, 267-68 (Pa. Super. 2004) (citation omitted).  The Commonwealth may prove this specific intent to kill by circumstantial evidence.  <u>Randall</u>, 758 A.2d at 674.

Muff alleges that there was no evidence in the record to support the conclusion that she had formed the conscious intention to kill the baby.  Instead, in her view, all of the record evidence demonstrated that "Muff shook the baby following an accidental fall out of frustration that the baby was not responding and/or in an effort to revive it, and then, 'losing it for a second,' threw the baby to the floor."  Pet'r's Mem. of Law in Supp. Pet., p. 56.  Such unintentional acts, Muff submits, cannot support a finding of guilt for a crime higher than third degree murder.  Muff contends that because the element of intent was not proven, the prosecution failed to meet its burden to prove each element of the crime beyond a reasonable doubt.

The Superior Court determined that the jury was presented with sufficient evidence from which they could infer Muff's intent to kill Madison.  As noted above, a defendant's state of mind can be established by the inference that the defendant intended the natural and probable consequences of her act.  The number and type of injuries that Madison sustained, particularly to her head, constitute the application of deadly force to her person.  These injuries were so severe that a reasonable juror could infer that death was a natural and probable consequence of their infliction, particularly on a

-16-

twelve month-old child.  The Superior Court also found that even
if it were to believe Muff's trial testimony that the injuries
resulted from an accidental fall, the record clearly reflects
that Muff never sought medical attention for Madison and, indeed,
repeatedly concealed the nature of Madison's injuries from her
family, medical care-givers and the police.[8]  Madison's death was
a natural and probable consequence of abandoning the seriously
hurt child in her crib and gives rise to the inference that Muff
had formed the conscious intent to kill her.  The Superior Court
reasonably determined the underlying facts and reasonably applied
the applicable law to the facts to conclude that Muff possessed
an intent to kill sufficient to convict Muff for first degree
murder.  No federal constitutional violation occurred.

V.

8.  It is undisputed that on at least five occasions on
December 1, 1998, Muff failed to inform anyone that Madison had
fallen or that anything out of the ordinary had happened.
Evidence was introduced at trial that Muff did not call 911 for
help until after Madison's mother arrived early from work and saw
the child lying rigid in a bed.  Muff never told Bierling on that
day that Madison had fallen.  After the police and paramedics
arrived, Muff was again asked if anything unusual had happened to
Madison that day.  She answered in the negative.  Madison's
grandmother called Muff from the hospital to ask if anything out
of the ordinary had happened, and again she answered in the
negative.  Later that day, Madison's aunt visited Muff and asked
her about Madison's injuries.  Muff insisted that nothing
traumatic had happened.  Dr. Peter Peacock, the emergency room
physician treating Madison, also telephoned Muff to obtain a
history of the day's events so that he could properly treat
Madison, who was there at the hospital.  Once again, Muff claimed
that nothing had happened.  It was not until Muff's second
statement to the police that she even acknowledged an accident
that resulted in Madison hitting her head.

A.

Muff, as noted above, makes five separate claims that her right to effective assistance of counsel was violated.  The "clearly established federal law" applicable to these claims is the familiar two-pronged test the Supreme Court articulated in Strickland v. Washington, 466 U.S. 668 (1984); see also Stevens v. Delaware Corr. Ctr., 295 F.3d 361, 369 (3d Cir. 2002).  Under Strickland, Muff must first establish that her counsel's performance was constitutionally deficient by showing that his representation "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  Second, Muff must show that there is a "reasonable probability" that her counsel's deficient performance prejudiced her defense so that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.

The Superior Court used the correct standard under Pennsylvania law in considering Muff's claims for ineffective assistance of counsel.  Although Pennsylvania law breaks the two-part Strickland test into three parts, the Pennsylvania Supreme Court has expressly recognized that the tests are, in fact, identical under both the United States and Pennsylvania Constitutions and offer the same degree of protection to defendants.  Commonwealth v. Charles Pierce, 527 A.2d 973, 976-77 (Pa. 1987).  In Pennsylvania, the defendant must show:  "(1) that the underlying claim is of arguable merit; (2) that counsel's performance lacked a reasonable basis; and (3) that the

-18-

ineffectiveness of counsel caused him prejudice." Commonwealth v. Miller, 746 A.2d 592, 598 (Pa. 2000).  As with the Strickland test, a failure of petitioner to satisfy either prong of the ineffectiveness test requires rejection of the claim.

The law presumes counsel to be effective, and it is the petitioner who has the burden of showing otherwise.

> Judicial scrutiny of counsel's performance must be highly deferential. ... Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Strickland v. Washington, 466 U.S. 668, 689 (1984) (internal quotations omitted).

B.

Muff first submits that she was denied the Sixth Amendment right to the effective assistance of counsel when trial counsel made what she characterizes as the unreasonable decision to present a defense that he knew would be debunked as a matter of basic science and stood no reasonable chance of success, actively encouraged her to perjure herself, and formulated his entire defense on the mistaken assumption that he was bound to present whatever defense his client first presented to him, irrespective of how unreasonable he himself thought the defense was.  She further argues that her new counsel rendered

-19-

ineffective assistance in failing to raise this substantive claim
on direct appeal.

This court must first determine whether it should
consider the merits of this claim or whether the claim should be
barred as procedurally defaulted.  Muff raised this ineffective
assistance of counsel claim for the first time at her PCRA
hearing when she argued that both trial and direct appeal counsel
were ineffective.  The PCRA trial court considered the question
and determined that trial counsel had a "reasonable trial
strategy and a course of conduct designed to advance and promote
[Muff's] interest" and thus was not ineffective.  PCRA Ct. Mem.
Op., Oct. 17, 2003, pp. 9-10.  Similarly, the court found that
because trial counsel was not ineffective, direct appeal counsel
could not have been ineffective in failing to present the
meritless claim.  <u>Id.</u>

Muff appealed the PCRA court's decision to the Superior
Court, which addressed the claim in a footnote:

> After a thorough review of the record, we
> find this issue to be waived.  Because the
> direct appeal of this matter was litigated
> well before our Supreme Court's decision in
> <u>Commonwealth v. Grant</u>, 572 Pa. 48, 813 A.2d
> 726 (2002), and because Muff was represented
> by different counsel on direct appeal, Muff
> has waived any issue regarding the
> ineffectiveness of trial counsel because she
> could have raised it on direct appeal.  42
> Pa. Cons. Stat. Ann. § 9544(b); <u>see also</u>
> <u>Commonwealth v. Ragan</u>, 560 Pa. 106, 743 A.2d
> 390 (1999).  Further, Muff presents no issue
> here that direct appeal counsel was
> ineffective in failing to raise the asserted
> ineffectiveness of trial counsel.

Super. Ct. Mem. Op., Feb. 10, 2005, p. 2, n.5.  Contrary to the
Superior Court's conclusion, Muff did in fact present the issue
that direct appeal counsel was ineffective on pages 36-37 of her
PCRA Collateral Appeal Brief.

      While not completely agreeing with Muff's arguments
that there was no procedural default, the Commonwealth explicitly
states that this issue may be reviewed on the merits and that all
remaining issues regarding the claim have been properly
exhausted.  Commw.'s Answer to Pet., p. 11.  Thus, for present
purposes, we will assume that Muff is correct that her claim was
fairly presented to the Superior Court when she appealed the PCRA
court's determination and that the claim should not be considered
procedurally defaulted.  Since the Superior Court did not address
this issue on its merits, we will review it de novo rather than
under the deferential standards of § 2254(d).  See Rompilla, 355
F.3d at 247.

      Muff's first task in showing that she received
ineffective assistance of counsel is to establish that her trial
counsel's representation was objectively unreasonable.
Strickland, 466 U.S. at 688.  As noted above, she accuses trial
counsel of being ineffective for failing to advise her as to the
most effective defense and for failing to present that defense at
trial.  Muff describes this most effective defense as one that
would have acknowledged that criminal action did occur but that
characterized that action as non-intentional, impulsive and
reckless, supporting a verdict of less than first degree murder.

The record from the PCRA hearing, at which trial counsel testified, shows that he was a criminal defense attorney with over twenty-five years of experience in this area of practice.  He had tried numerous homicide cases and had extensive experience with both jury and non-jury trials.  In preparation for trial, counsel reviewed all of the discovery material provided by the Commonwealth, met with his client on many occasions, and discussed with her the Commonwealth's evidence, including the medical evidence which was inconsistent with her story.  He hired a forensic expert to review the medical records in the case, who made an oral report of his findings to counsel. In particular, the expert said he believed the nature of Madison's injuries was inconsistent with Muff's story of an accidental death.  Counsel then discussed those findings with Muff and explained that the expert's expected testimony would not be able to rebut the Commonwealth's medical evidence and would cause problems for Muff if she chose to testify.  When Muff repeatedly insisted on her innocence, counsel recommended that she testify and ultimately decided he would not be able to call the medical expert.  Although at one point Muff seemed distraught and close to admitting privately to counsel that she had committed some wrongdoing, Muff never did so.  Counsel also discussed with Muff the possibility of a guilty plea, but she made it clear that she would not plead guilty to any criminal offense.  At Muff's PCRA hearing, the court found trial counsel's testimony to be truthful and credible.

As discussed above, counsel presented the defense of accident at trial. Muff testified on her own behalf, and counsel called as witnesses a bio-engineer, who explained how Madison's major head injuries could be consistent with an accident such as Muff described. He also called numerous character witnesses who testified to a caring and loving relationship between Muff and Madison. During cross-examination, counsel attempted to elicit testimony from the Commonwealth's medical experts that many of the bruises and other minor injuries Madison sustained could have been a result of the emergency medical transport and treatment she received.

Muff first contends that trial counsel's failure to advise her as to the most effective defense violated his professional obligation to her, and he was ineffective as a result. Setting aside the question of whether counsel did have such a professional obligation and whether the alleged breach of this obligation constitutes constitutionally unreasonable performance, we find no evidence in the record that trial counsel is fairly chargeable with the conduct of which Muff accuses him. In fact, counsel, whose testimony was found credible by the PCRA court, specifically testified that he "discussed at length with [Muff] various alternatives on which [Madison's] injuries could have occurred." Notes of Testimony ("N.T."), 9/25/03, PCRA Hr'g, p. 12. Counsel additionally testified that:

> I confronted my client about the problems
> being raised by the medical opinions versus
> her version of the events that fateful day.

> I explained to Ms. Muff on a number of
> occasions that it would be okay if what
> really happened was that the baby fell in an
> accident, as she claimed, and then perhaps
> frustrated at or fearful of what had
> occurred, she shook the baby and/or threw the
> child to the floor.

Id. at 14.  Finally, when asked by PCRA counsel about whether he

considered using a defense other than accident, trial counsel

responded:

> A:  That goes back to the conversation I had
> with [Muff] as to how maybe these events could
> be explained on actions that may have occurred
> that were certainly not intentional, but not
> accidental, but perhaps closer to being
> reckless.
>
> Q:  Which would be a – something short of First
> Degree, like maybe Third Degree or a Voluntary
> Manslaughter?
>
> A:  That's correct.
>
> Q:  Okay.  So did you consider those defenses?
>
> A:  I discussed it with my client, yes.

Id. at 28-29.  Based on the facts of record, Muff's accusation

that counsel failed to advise her as to the most effective

defense is without merit.

Muff then attacks counsel's performance on the ground

that he failed to present at trial the most effective defense,

that Muff was guilty of some degree of criminal culpability but

that it did not rise to the level of first degree murder.  Her

argument is, again, without merit.  From counsel's first meeting

with Muff, she absolutely insisted – and continued throughout to

insist – that she had done nothing wrong.  She refused to

-24-

consider a guilty plea and maintained her innocence even when
confronted with evidence that called her veracity into question.
Counsel thoroughly investigated the matter and met with his
client many times.  He fashioned a defense that incorporated
Muff's testimony and was supported by expert testimony and
character witnesses.  He attempted to explain Madison's bruising
and other minor injuries.  He established that Muff had no motive
for the killing and that her prior long-term relationship with
the child was kind and loving.  He presented the jury with a
basis for an outright acquittal and also for a finding of guilt
on the lesser charge of involuntary manslaughter.  In sum, Muff's
trial counsel acted in an objectively reasonable manner when
crafting her accident defense and trial strategy.

        Muff suggests that counsel only put forward the defense
of accident because he misunderstood what his obligation was
under the law and mistakenly thought he had to advance the
defense that his client desired.  To support this argument, Muff
references the following exchange with trial counsel when he
testified at the PCRA hearing:

> Q:  Did you feel free to devise the defense
> in this case or did you feel as though [Ms.
> Muff] was interfering with your ability to do
> that?
>
> A:  Neither.  I felt I had to fashion a
> defense based on what my client was telling
> me.
>
> Q:  Okay.  You felt you had to fashion a
> defense based on what your client was telling
> you?

A:  Yes.

Q:  That's what you just said.  And that's
why you went with accident as the theory of
defense in this case, because that's what
Tricia was telling you all along?

A:  That's correct.

Id. at 27-28.  We find nothing in this exchange to indicate that
counsel did anything improper or that he believed that he was
required to present the version of events exactly as his client
related them.  A lawyer must make significant litigation
decisions in consultation with his client.  Strickland, 466 U.S.
at 688.  The exchange here establishes that, rather than devising
the defense without any input from his client, counsel
collaborated with her and considered her protestations of
innocence an important factor in making the decision to present
the defense of accident.  Counsel also agreed that the defense he
pursued "was consistent with what [his] client's wishes were, but
also a defense which [he] deemed a viable defense in the case."
Id. at 41-42.

        We find that not only was counsel's decision in this
respect eminently reasonable, it is much more reasonable than
what petitioner would apparently have had counsel do.  If we
accept petitioner's arguments, trial counsel should have argued
to the jury that Muff was guilty of some sort of criminal
conduct, contrary to her avid protestations and in diametric
opposition to her wishes.  In effect, he would have given Muff no
choice but to accept some criminal responsibility, which he knew

she refused to do.  If counsel had done this, Muff may well have
had a compelling basis to protest her counsel's performance.

        Muff also submits that her counsel was ineffective when
he failed to dissuade her from testifying falsely.  Rule
3.3(a)(3) of the Pennsylvania Rules of Professional Conduct
states that "A lawyer shall not knowingly ... offer evidence that
the lawyer knows to be false. ...  A lawyer may refuse to offer
evidence, other than the testimony of a defendant in a criminal
matter, that the lawyer reasonably believes is false."  Again,
even assuming that a breach of this obligation rises to the level
of constitutionally unreasonable performance, the record does not
indicate that trial counsel failed to comply with this
obligation.

        Rule 3.3 prohibits a lawyer from offering testimony
from a witness only when he _knows_ that that testimony would be
false.  There is no indication that trial counsel knew that
Muff's testimony was false, even though he may have reasonably
believed that it was.  See _id._, comment [8].  According to Muff,
trial counsel conceded that he knew Muff's testimony was false
while testifying at the PCRA hearing.  She mischaracterizes his
testimony.  The colloquy reads:

        Q:  Do you think [Ms. Muff's version of events] had
problems?

        A:  Yes, it had problems, yes.
N.T., 9/25/03, PCRA Hr'g, p. 25.  Admitting that a defendant's
testimony "had problems" is a far cry from an admission that

-27-

counsel knew that her testimony was actually untrue.  Although
counsel certainly recognized the inconsistencies between Muff's
testimony and the medical evidence, each time he presented her
with factual scenarios which would have indicated even some
criminal culpability, Muff insisted "that's not what happened."
Id. at 29.  In a case where it may not be clear whether the
client's testimony is truthful, "a lawyer should resolve doubts
about the veracity of testimony or other evidence in favor of the
client."  Pa. Rules of Prof. Conduct, Rule 3.3, comment [8].  As
there is no evidence suggesting that counsel knew his client
would testify falsely, Muff's ineffective assistance of counsel
argument fails.

C.

        Muff next claims that she was denied the effective
assistance of counsel when trial counsel failed to object to the
trial court's jury instructions on malice and the difference
between first and third degree murder, and also failed to request
an instruction that where the defendant acts with "passion" but
without adequate provocation, third degree murder is the
appropriate verdict.  She argues that the instructions given at
her trial were confusing and incomplete and resulted in the
prosecution securing a conviction for first degree murder without
requiring it to meet its burden to prove the element of intent.
This claim was exhausted in state court.  Although there was some
question whether direct appeal counsel preserved this claim as a
distinct violation of the United States Constitution, the

-28-

Superior Court on PCRA appeal found that the federal claim was
raised on direct appeal.  We agree.  In its opinion on direct
appeal, the Superior Court dealt briefly with the claim and
concluded that the trial court "fully apprised the jury on the
issue of malice and first and third degree murder."  Super. Ct.
Mem. Op., June 25, 2001, p. 16.

        Muff argues that because the Superior Court's
consideration of her contention was limited, the opinion was not
of "the level and quality of reasoning that is entitled to
deference under AEDPA" and that de novo review was thus
warranted.  Pet'r's Mem. of Law in Supp. Pet., p. 69.  In support
of this conclusion, Muff cites three cases:  Hameen v. Delaware,
212 F.3d 226 (3d Cir. 2000); Appel v. Horn, 250 F.3d 203, 210 (3d
Cir. 2001); and Everett v. Beard, 290 F.3d 500 (3d Cir. 2002).
Our Court of Appeals had occasion to revisit these three
decisions in Chadwick v. Janecka, 312 F.3d 597, 606 (2002).
There, the Court of Appeals noted that in Weeks v. Angelone, 528
U.S. 225 (2000), "the Supreme Court clearly held that the
§ 2254(d) standards apply when a state supreme court rejects a
claim without giving any indication of how it reached its
decision."  Id. at 606 (citations and internal quotations
omitted).  The court went on to explain that "Hameen, Appel, and
Everett govern when the opinion of a state court reveals that it
did not adjudicate a claim; Weeks applies when a claim is
rejected without explanation."  Id.  The Court of Appeals held in
Chadwick that the deferential standard of § 2254(d) should apply

-29-

because the Pennsylvania Supreme Court had rejected the petitioner's claim on the merits, although without explanation. Id.  In the instant case, the Superior Court decided Muff's claim on the merits and included a minimal explanation for its decision.  Under Chadwick, we must treat the Superior Court decision deferentially.

Muff then contends that even under a deferential standard, the Superior Court's decision was contrary to clearly established federal law.  The Supreme Court has held that a criminal conviction cannot stand where the prosecution's burden is lessened on any element of the crime.  Sandstrom v. Montana, 442 U.S. 510 (1977).  A faulty or confusing jury instruction on the elements of an offense has the effect of reducing the prosecution's burden of proof and thus violates the due process rights of the defendant.  Id.  The Court has stated that  "when there exists a reasonable possibility that the jury relied on an unconstitutional understanding of the law in reaching a guilty verdict, that verdict must be set aside." Francis v. Franklin, 471 U.S. 307, 322 n.8 (1985) (citing Stromberg v. California, 283 U.S. 359 (1931), other citations omitted).

Specifically, Muff asserts that the trial court defined the concept of "malice" as if it were the same for both first and third degree murder.  She further asserts that the court did not make clear that malice deriving from an intent to kill was exclusively applicable to first degree murder and that only malice deriving from an intent to inflict serious bodily injury

-30-

or malice deriving from a reckless disregard of consequences should be considered for third degree murder.  Muff submits that this "muddied the waters" and interfered with the jury's full consideration of the option of third degree murder.  According to Muff, this created an unacceptable risk that the jury would incorporate the element of intent from first degree murder into third degree murder, making the issue of intent irrelevant.  This, in turn, would liberate the prosecution from its burden of proving intent for a verdict of first degree murder.

In addition, Muff argues that, under the facts, the jury could have found that she killed Madison in a state of passion, but without adequate provocation, as a 12-month-old baby cannot legally "provoke" the assault which occurred here.  Super. Ct. Mem. Op., June 25, 2001, p. 17; see also Commonwealth v. Browdie, 671 A.2d 668, 670-71 (Pa. 1996).  When a defendant kills under these circumstance, it would constitute third, as opposed to first, degree murder.  Muff claims that it was error when her counsel failed to request an instruction regarding passion with inadequate provocation, because without such an instruction, Muff lost the opportunity to be convicted of this lesser offense.

The trial court's instructions on first and third degree murder were copied verbatim from the Suggested Standard Criminal Jury Instructions of Pennsylvania.  See SSJI §§ 15.2501A, 15.2502A, 15.2502C (Rev. 12/88).  During their deliberations, the jury asked to be re-instructed on first and third degree murder and the trial court did so, again basing the

instructions on the standard charge.  The jury charge defined
malice, which is required for conviction on either murder charge
and outlined the elements of both first and third degree murder.
The charge stated that only first degree murder required a
finding that Muff acted with a specific intent to kill and that
third degree murder required a finding of malice but does not
require a finding of specific intent to kill.

The Superior Court concluded that the instructions on
these points were a full and adequate explanation of the law.  We
agree.  The Superior Court's determination was not in violation
of the Constitution.  The jury charge, taken from the Suggested
Standard Criminal Jury Instructions of Pennsylvania, did not
reduce the prosecution's burden of proof.  Accordingly, trial
counsel was not unreasonable in failing to object to them or to
request an additional instruction on this point.  Muff's right to
the effective assistance of counsel was not violated in this
regard.

D.

Muff further contends that she was denied the effective
assistance of counsel when trial counsel failed to request an
instruction on voluntary manslaughter.  Although there was some
question whether direct appeal counsel preserved this claim as a
distinct violation of the United States Constitution, the
Superior Court on PCRA appeal found that the federal claim was
raised on direct appeal.  We agree, and find that any available
state remedies were exhausted.

-32-

In its opinion on direct appeal, the Superior Court
began by defining voluntary manslaughter:

> (a) **General Rule.** – A person who kills an
> individual without lawful justification
> commits voluntary manslaughter if at the time
> of the killing he is acting under a sudden
> and intense passion resulting from serious
> provocation by ... the individual killed.

Super. Ct. Mem. Op., June 25, 2001, p. 16 (citing 18 Pa. Cons.
Stat. Ann. § 2503(a)).  The court then correctly outlined when a
voluntary manslaughter charge is required and applied the
"passion" and "provocation" language from the definition of
voluntary manslaughter to the facts.  The court determined that
Muff's actions with respect to Madison were not the kind of
actions contemplated for voluntary manslaughter because Muff was
not acting under the necessary "passion" and Madison was not
capable of such "provocation" that would result in the infliction
of fatal injuries.  Id. at 17.  The court then concluded that
trial counsel was not ineffective for failing to request such a
charge.  Id.  Because the Superior Court plainly considered the
merits of Muff's contention, we review the Superior Court's
decision under the deferential standard articulated in § 2254(d).

Muff believes that the Superior Court's decision was
objectively unreasonable under the circumstances.  28 U.S.C.
§ 2254(d).  Although the Commonwealth did not pursue the
indictment's voluntary manslaughter charge against Muff at trial,
she argues that there was evidence introduced that would support
such a charge and that she was therefore entitled to a jury

-33-

instruction on voluntary manslaughter.  Specifically, Muff notes
that the defense argued at trial that the killing was not done
with malice and the Commonwealth presented evidence that Muff
"lost it" as a result of the victim's crying and spitting up.

Muff has the burden of showing that trial counsel's
unreasonable performance prejudiced her defense and may have
affected the outcome of her case.  Strickland, 466 U.S. at 688.
Muff is not able to establish that the reasoning in the Superior
Court opinion is objectively unreasonable in this regard.  As the
Superior Court implicitly found, trial counsel's performance was
not unreasonable.  "[A] trial court shall only instruct on an
offense where the offense has been made an issue in the case and
where the trial evidence reasonably would support such a
verdict."  Browdie, 671 A.2d at 674 (Pa. 1996).  It is clear from
the Superior Court's opinion that, after considering the facts of
the case, the trial evidence would not reasonably support a
verdict of voluntary manslaughter because neither sufficient
passion nor provocation was demonstrated.  Super. Ct. Mem. Op.,
June 25, 2001, p. 17; see also Browdie, 671 A.2d at 670-71 (Pa.
1996).  Thus, Muff was not entitled to have the jury charged on
voluntary manslaughter, and her counsel cannot be found to have
acted unreasonably for failing to make that request.

E.

Muff next submits that trial counsel was ineffective
when he failed to request a jury instruction on homicide by
misadventure, a form of excusable killing.  Again, despite some

-34-

question as to whether direct appeal counsel preserved this claim
as a distinct violation of the United States Constitution, the
Superior Court on PCRA appeal found that the federal claim was
raised on direct appeal.  We agree that this claim was properly
exhausted in state court.  The Superior Court addressed this
claim in its opinion on direct appeal and found it to be
meritless.  Super. Ct. Mem. Op., June 25, 2001, p. 17-19.  Thus,
we will review it under the deferential standards of § 2254(d).

       The Superior Court set out the factors that must be
shown to establish that a killing was excusable as a
misadventure:

> [Homicide by accidental misadventure]
> comprehends an unintentional and accidental
> killing while the actor is performing a
> lawful act unaccompanied by criminal
> negligence.  Three elements enter into the
> defense of excusable homicide by
> misadventure:  (1) The act resulting in death
> must be a lawful one.  (2) It must be done
> with reasonable care and due regard for the
> lives and persons of others.  (3) The killing
> must be accidental and not intentional, or
> without unlawful intent, or without evil
> design or intention on the part of the
> slayer.

Commonwealth v. Newman, 456 A.2d 1044, 1046 (Pa. Super. 1983)
(quotations and citations omitted).  After considering the
evidence from trial under this standard, the Superior Court
erroneously stated that Muff testified at trial to throwing
Madison down.  The court then concluded that because the act of
throwing Madison down could have had no lawful purpose, the
evidence could not have supported a charge for homicide by

misadventure.  Thus, according to the court, Muff's claim that
the jury should have been instructed on homicide by misadventure
had no merit, and trial counsel could not be ineffective for
failing to raise it.

Muff contends that the Superior Court's ruling was
objectively unreasonable because it ignored Muff's actual trial
testimony that the injuries to Madison were completely
accidental.  The jury members were free to believe that
testimony, Muff argues, and if they had done so, could have
concluded that homicide by misadventure was a proper instruction.

Muff errs when she states that the Superior Court's
ruling was an unreasonable application of clearly established
law.  28 U.S.C. § 2254(d).  Under that law, Muff had the burden
of showing that trial counsel's unreasonable performance
prejudiced her defense and may have affected the result of her
case.  Strickland, 466 U.S. at 688.  Nowhere does Muff explain
how she was prejudiced by the lack of a homicide by misadventure
instruction.  "An accidental misadventure ... is inconsistent
with a homicide.  By definition, a homicide involves the
intentional, knowing, reckless or criminally negligent death of
another human being."  Commonwealth v. Newman, 456 A.2d at 1047.
Although Muff testified at trial that Madison's death was
accidental, the jury clearly chose to discredit that testimony
when it reached its verdict.  If the jury had believed Muff's
testimony that Madison's fatal injuries were accidentally
inflicted, it would have acquitted her or convicted her of third

-36-

degree murder or involuntary manslaughter.  The Superior Court's conclusion that Muff's ineffective assistance of counsel claim had no merit was certainly not "an outcome that cannot reasonably be justified under existing Supreme Court precedent." Outten, 464 F.3d at 414 (internal citations omitted).  The failure to request a charge on homicide by misadventure does not give rise to a reasonable probability that the result of proceeding would have been different.

F.

Finally, Muff alleges that she was denied the effective assistance of counsel when trial counsel failed to request that the jury be instructed on the voluntariness of Muff's third statement to the police.  In that statement, Muff admitted for the first time that she had thrown Madison down to the ground. This exact issue was raised on direct appeal and has been exhausted in the state courts.

As with her other claims of ineffective assistance of counsel, Muff suggests that this should be reviewed de novo.  The Superior Court stated only the following with respect to this claim:

> The issue concerning the voluntariness of
> appellant's statements to the police has been
> addressed above [referring to the court's
> discussion of Muff's suppression claim].  In
> accordance with our finding [that] the
> statements were made voluntarily by the
> appellant while she was not in custody, we
> find appellant's argument is without merit.

Super. Ct. Mem. Op., June 25, 2001, p. 15.  The Superior Court
clearly considered the voluntariness issue to be co-extensive
with the suppression issue.  Muff, however, contends that the two
claims were quite distinct.  The suppression claim argued that
Muff's third statement to police should be suppressed on the
constitutional ground that the police refused to cease
interrogation once she invoked her right to counsel and gave her
misleading information regarding her right to counsel.  The
voluntariness claim, on the other hand, was a question of
whether, even if the interrogation was lawful, Muff's counsel was
ineffective for failing to request a jury instruction on
voluntariness as Pennsylvania case law and the Suggested Standard
Criminal Jury Instructions direct.

          We agree with Muff that the claims are distinct and
should have been treated separately.  In Appel v. Horn, our Court
of Appeals held that when the Pennsylvania Supreme Court treated
a habeas claim for constructive denial of counsel as one for
ineffective assistance of counsel, its opinion did not merit
deferential treatment under § 2254(d).  250 F.3d 203, 210 (3d
Cir. 2001).  The court explained that because the two claims were
different and are evaluated under different tests, the
Pennsylvania Supreme Court did not actually decide the claim for
constructive denial of counsel on its merits and affirmed the
district court's use of de novo review.  Id.  Similarly, here,
the Superior Court disposed of Muff's ineffective assistance of
counsel claim by treating it as equivalent to her suppression

claim and thus did not address the claim on its merits. We will
review this claim de novo.

The circumstances of Muff's third statement to the
police are not in dispute. After Madison was pronounced dead in
the early morning hours of December 2, 1998, the police began a
homicide investigation into her death. They obtained a search
warrant for Muff's home to take photographs and find evidence of
injuries. At approximately 4:30 that afternoon, three officers
and a detective arrived at Muff's home to execute the warrant.
The detective asked Muff to come to the police station for a
third time. Muff voluntarily agreed to do so. At approximately
6:20 that evening, Muff and her husband arrived at the station,
having traveled there independently of any police officer.

Once at the station, Muff was taken to the same
conference room where she had given her first two statements, and
her husband waited outside the detective division room door.
Inside the conference room, the detective presented Muff with the
Upper Darby Township Police Department's official form advising
her of her rights. The detective testified at trial that he also
told Muff she was not under arrest but that he wanted to speak
with her further because of the discrepancies between the
description of the events she have previously given the police
and the injuries sustained by Madison.

The detective took Muff though the <u>Miranda</u> rights on
the form and asked if she understood each one. Muff answered
"yes" in each case. The detective noted her answers, and Muff

-39-

then initialed them.  Before Muff signed the form, she asked the
detective, "Do I need an attorney now?"  The detective responded,
"If you're placed under arrest concerning Madison's death, you
will need an attorney.  The decision to have an attorney present
is up to you.  You're not under arrest at this time.  And you are
free to leave.  You do not have to make a statement now."  Muff
repeated, "I'm not under arrest?"  The detective confirmed, "No,
you're not under arrest."  Muff then agreed to give a statement
and did so.  She explained again how Madison had fallen.  She
then admitted that she had "lost it for a second" and had thrown
Madison on the ground one time after Madison had vomited and was
crying.  The entire interaction lasted approximately thirty
minutes.  After signing her statement, Muff left the station with
her husband.  A criminal complaint was not filed against Muff
until five days later.

        As noted above, to succeed on an ineffective assistance
of counsel claim, Muff must establish both that her counsel's
performance "fell below an objective standard of reasonableness"
and that there is a "reasonable probability" that the deficient
performance prejudiced her defense so that the mistake or
omission may have affected the result of the proceeding.
Strickland, 466 U.S. at 688, 694.

        On these facts, we believe that trial counsel's
performance in not seeking an instruction on voluntariness was
objectively reasonable as the voluntariness of Muff's statements
was not put at issue during the trial.  However, even if trial

counsel was unreasonable in failing to request such an
instruction, Muff is unable to demonstrate the required prejudice
to her case.  To show that the lack of a jury instruction on
voluntariness was prejudicial to Muff's case, she must logically
show two things.  First, she must establish the existence of a
reasonable probability that, had they been given the appropriate
instruction, the jury would have found that Muff's statement to
the police was involuntary.  Given all of the circumstances
surrounding her statement, Muff has not made such a showing.
There was overwhelming evidence that the statement was
voluntarily made.  She was an adult who agreed to a request to
return to the police station.  She drove herself there, in the
early evening, accompanied by her husband, and had a thirty
minute conversation with a detective who repeatedly informed her
that she could leave at any time and did not have to give a
statement.  Second, as detailed above, the evidence strongly
supports the jury's verdict.  Muff has not shown that there is a
reasonable probability that the absence of a request for a charge
on the involuntariness of her third statement would have caused
the result of the proceeding to be different.  Id. at 694.

                              VI.

        Finally, Muff claims that she was denied her Fifth
Amendment privilege against self-incrimination and her Fifth and
Sixth Amendment rights to counsel when the trial court admitted
into evidence her third statement to police.  After a pre-trial
suppression hearing considering this question on April 16, 1999,

                             -41-

the trial court found that Muff was not in custody at the time she made the incriminating statement to the police and thus that her statement could be introduced.  Muff argued on direct appeal that the introduction of this evidence violated her federal constitutional rights, as set forth in Miranda v. Arizona, 384 U.S. 436 (1966), and she has otherwise exhausted all available state remedies regarding this claim.  Muff acknowledges that the Superior Court considered this issue on the merits and that this court should apply the deferential standards of § 2254(d) in its review.

Instead, Muff argues that the Superior Court unreasonably applied clearly established federal law to the facts of this case when it determined that she was not in custody at the time she made her third statement.  She suggests that a reasonable person in her position would have felt that her freedom of movement had been restricted when she returned to the police station for the third time to give a statement.  Muff argues further that when she asked the detective, "Do I need an attorney now?", she was invoking her right to counsel such that the detective had the obligation to "inform[] her that she could or might benefit from having an attorney present with her at the time she decided whether to proceed with the interrogation at police headquarters."  Pet'r's Mem. of Law in Supp. Pet., p. 84. She submits that the detective's response to her was misleading, inaccurate, and violated her rights under Miranda.

The relevant facts regarding Muff's third statement to the police were set forth in detail above.  On these facts, the Superior Court determined that Muff was not in custody at the time she made this third statement.  It reasoned that because Muff was repeatedly told by the police that she was free to leave and that she did in fact leave, she was not denied her freedom of action in any significant way and could have reasonably believed that her freedom of action or movement were restricted by the interrogation.  The court correctly recognized that the protections of <u>Miranda</u> are only triggered when the suspect is in police custody.  384 U.S. at 444.  Because Muff was not in custody, the court concluded, no <u>Miranda</u> violation could have occurred.

We see no reason to disturb the Superior Court's conclusion.  We presume the Superior Court's factual findings to be correct under § 2254(e) and Muff has not rebutted the presumption.  Under the facts, the Superior Court's ruling that Muff was not in custody is eminently reasonable.  Her Fifth Amendment privilege against self-incrimination and her Fifth and Sixth Amendment rights to counsel under <u>Miranda</u> were simply not violated.

## VII.

Accordingly, the petition of Tricia Muff for habeas corpus relief under 28 U.S.C. § 2254 will be denied.

-43-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TRICIA MUFF                    :         CIVIL ACTION
                               :
            v.                 :
                               :
MARTIN L. DRAGOVICH, et al.    :         NO. 05-5251

ORDER

        AND NOW, this 12th day of March, 2007, for the reasons
set forth in the accompanying Memorandum, it is hereby ORDERED
that:

        (1)  the petition of Tricia Muff for habeas corpus
relief under 28 U.S.C. § 2254 is DENIED; and

        (2)  a certificate of appealability is not issued.


                        BY THE COURT:


                        ____/s/ Harvey Bartle III____
                                              C.J.